**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application for Correction of Birth Record of Adelaide*, Slip Opinion No. 2024-Ohio-5393.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5393

IN RE APPLICATION FOR CORRECTION OF BIRTH RECORD OF ADELAIDE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application for Correction of Birth Record of Adelaide*, Slip Opinion No. 2024-Ohio-5393.]**

*Court of appeals' judgment left undisturbed in the absence of a majority to render a judgment.*

(No. 2022-0934—Submitted April 4, 2023—Decided November 19, 2024.)

APPEAL from the Court of Appeals for Clark County,

No. 2022-CA-1, 2022-Ohio-2053.

_____

{¶ 1} In the absence of a majority, which is necessary to render a judgment, *see* Ohio Const., art. IV, § 2(A), the judgment of the Second District Court of Appeals is left undisturbed.

FISCHER, J., would affirm the court of appeals' judgment, as explained in an opinion.

DONNELLY, J., would affirm the court of appeals' judgment, as explained in an opinion joined by STEWART, J.

BRUNNER, J., would reverse the court of appeals' judgment and remand the cause to the probate court, as explained in an opinion.

DETERS, J., would reverse the court of appeals' judgment and remand the cause to that court, as explained in an opinion joined by KENNEDY, C.J., and DEWINE, J.

_____

**FISCHER, J., for affirming the court of appeals' judgment.**

{¶ 2} This court accepted jurisdiction over appellant Hailey Emmeline Adelaide's appeal from the Second District Court of Appeals' judgment upholding the Clark County Probate Court's judgment denying her application to correct the sex marker on her birth certificate. *See* 2022-Ohio-3546; 2022-Ohio-2053 (2d Dist.). However, we now leave the Second District's judgment undisturbed and decline to address the propositions of law accepted for review because we cannot reach a consensus on how this case should be resolved. While there is a majority that rejects the position adopted by the fourth separate opinion concerning the unbriefed issue of adversity, there is division among that majority on how this court should resolve the propositions of law. It is an unfortunate day for the litigants in this case and Ohioans that we cannot reach a consensus.

{¶ 3} Because we are unable to reach a consensus and issue a judgment, arguably, any opinion released in this case would be advisory. Indeed, it is our judicial responsibility to refrain from giving opinions, premature declarations, or advice on *potential* controversies. *See Fortner v. Thomas*, 22 Ohio St.2d 13, 14 (1970). However, in this case, there is a controversy and a party who deserves a clear answer from this court. Thus, I feel compelled to voice my separate opinion, despite this court being unable to issue a judgment, so that the parties and Ohioans may better understand the reasons for the entry released by this court.

## I. An unbriefed issue that alters the appellate court's subject-matter jurisdiction should not be resolved by this court without supplemental briefing

{¶ 4} We accepted three propositions of law challenging the merits of the denial of Adelaide's application to correct the sex marker on her birth certificate. *See* 2022-Ohio-3546. The propositions of law addressed the statutory interpretation of R.C. 3705.15 and the probate court's "authority" to "correct" Adelaide's birth certificate.

{¶ 5} It was at oral argument that we questioned whether adversity was at issue given that no party had opposed Adelaide's application. Counsel for Adelaide acknowledged that no party opposed Adelaide's application but was nevertheless adamant that this court should review this matter based on caselaw and this court's power of judicial review under the Ohio Constitution. Counsel also did not oppose this court's ordering supplemental briefing or appointing a party to represent the State of Ohio's interest. However, this court never ordered supplemental briefing on the issue of adversity or appointed a party to represent the State's interest, and I think this was an egregious judicial mistake.

{¶ 6} When an issue comes to light after initial briefing is completed and it is necessary for us to address that issue to resolve the matter before the court, especially concerning subject-matter jurisdiction, we can and usually do order supplemental briefing. *See* S.Ct.Prac.R. 16.08 and 17.09(A); *see also State v. Jones*, 2023-Ohio-4615 (sua sponte ordering the parties to brief whether this court had jurisdiction over the appeal under Article IV, Section 2 of the Ohio Constitution before resolving the appeal on the merits); *Repp v. Best*, 2023-Ohio-1027 (sua sponte ordering the parties to brief whether a judge who receives a six-month suspension from the practice of law results in a "vacancy" under R.C. 1901.10, given the removal procedures in the Ohio Constitution); *Preterm-Cleveland v. Yost*, 2023-Ohio-4117 (sua sponte ordering the parties to brief the effect of the passage

of Issue 1). And we have requested supplemental briefing from the attorney general of Ohio when a matter was likely to have an impact on the State. *See In re Adoption of Y.E.F.*, 2019-Ohio-3749 (sua sponte requesting that the attorney general file an amicus brief to address whether the probate court's denial of a request for appointment of counsel constituted a final, appealable order and whether the State was required to provide counsel to indigent parents facing termination of parental rights by adoption in probate court).

{¶ 7} If this court is going to resolve an unbriefed question that relates to the subject-matter jurisdiction of the lower courts and that necessarily requires interpretation of the Ohio Constitution, as is suggested by the fourth separate opinion, we should order supplemental briefing to ensure that all matters are considered and that our decision does not have unintended consequences. *See State ex rel. Maxcy v. Saferin*, 2018-Ohio-4035, ¶ 33 (Fischer, J., dissenting) (stating that the court was unable to give full and fair consideration to how two constitutional provisions interacted when the issue was not briefed). Thus, I would have ordered supplemental briefing on the issue of adversity and requested that the attorney general of Ohio and/or Ohio's state registrar, *see* R.C. 3705.03(A), file a merit brief or an amicus brief to inform our review of this matter.

## II. I am not convinced that there is an adversity issue in this case

{¶ 8} Without the benefit of briefing on the issue of adversity, the fourth separate opinion, joined by two other justices, would hold that the court of appeals, not the probate court, lacked the power to decide Adelaide's appeal because of a lack of adversity. Separate opinion of Deters, J., ¶ 94. To find a lack of adversity, the fourth separate opinion concludes that no adverse interest to Adelaide's application exists. *Id.* at ¶ 102. The fourth separate opinion's conclusion that the appellate court lacks jurisdiction because adversity is lacking is not fully convincing and is yet another reason why I strongly believe that supplemental briefing should have been ordered in this case.

4

**{¶ 9}** The Ohio Constitution provides that "[t]he judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the Supreme Court as may from time to time be established by law." Ohio Const., art. IV, § 1. In 1877, this court noted that the term "judicial power" did not have a defined meaning and that the jurisdiction of Ohio's courts was "such as may be prescribed by law." *State ex rel. Atty. Gen. v. Harmon*, 31 Ohio St. 250, 258 (1877); *see also* Ohio Const., art. IV, § 18. Thus, this court expressed that "judicial power, within the meaning of the constitution, is to be determined in the light of the common law and of the history of our institutions as they existed anterior to and at the time of the adoption of the constitution." *Harmon* at 258. This court further stated that judicial power is the "authority to hear and determine a controversy upon the law and fact." *Id.* Therefore, judicial power in essence refers to a court's jurisdiction to decide a matter. *See Corder v. Ohio Edison Co.*, 2020-Ohio-5220, ¶ 14 ("Subject-matter jurisdiction refers to the constitutional or statutory power of a court to adjudicate a particular class or type of case."); *Pratts v. Hurley*, 2004-Ohio-1980, ¶ 11 (stating that jurisdiction is a court's statutory or constitutional power to adjudicate a case); *Morrison v. Steiner*, 32 Ohio St.2d 86 (1972), paragraph one of the syllabus ("Subject-matter jurisdiction of a court connotes the power to hear and decide a case upon its merits . . . .").

**{¶ 10}** While all judicial power has been vested since 1851 in the various Ohio courts under Article IV, Section 1, the Ohio Constitution has since been amended to specifically set forth the subject-matter jurisdiction of each of the Ohio courts: Article IV, Section 2 sets forth the organization and jurisdiction of this court; Article IV, Section 3 sets forth the organization and jurisdiction of the courts of appeals; and Article IV, Section 4 sets forth the organization and jurisdiction of the courts of common pleas. *See* Milligan & Pohlman, *The 1968 Modern Courts Amendment to the Ohio Constitution*, 29 Ohio St.L.J. 811, 840-845 (1968).

{¶ 11} Article IV, Section 4(B) limits the jurisdiction of the *courts of common pleas* and divisions thereof to "justiciable matters . . . as may be provided by law." *See also State ex rel. Barclays Bank PLC v. Hamilton Cty. Court of Common Pleas*, 1996-Ohio-286, ¶ 21; *McQueen v. Dohoney*, 2013-Ohio-2424, ¶ 13 (1st Dist.). The justiciability requirement is set forth in the Ohio Constitution only in Article IV, Section 4(B), and this court has explained that "justiciable matters" are limited to "'actual controversies between parties legitimately affected by specific facts,' " *Barclays Bank* at ¶ 21, quoting *Fortner*, 22 Ohio St.2d at 14. When deciding "actual controversies," courts are "not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter at issue in the case before it." *Travis v. Pub. Util. Comm.*, 123 Ohio St. 355, 359 (1931).

{¶ 12} Article IV, Section 3 provides that the subject-matter jurisdiction of the courts of appeals is limited to matters in which a court of appeals has original jurisdiction, Ohio Const., art. IV, § 3(B)(1), "jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district," Ohio Const., art. IV, § 3(B)(2), or "appellate jurisdiction as may be provided by law to review and affirm, modify, or reverse final orders or actions of administrative officers or agencies," *id.* Relevant to this case, the General Assembly has provided courts of appeals with jurisdiction to review final orders, as defined by R.C. 2505.02(B), and "any final order, judgment, or decree of the probate court" on a question of law under R.C. 2101.42. Hence, as a matter of constitutionality and statute, there is no specific or explicit "justiciability" requirement placed on *courts of appeals* under the Ohio Constitution.

{¶ 13} Rather, the requirement for adversity flows from the justiciability requirement on the courts of common pleas' subject-matter jurisdiction. *See* Ohio Const., art. IV, § 4(B). On appeal, this court and the courts of appeals are concerned

about adversity not because it affects appellate jurisdiction, but because it is necessary to invoke the jurisdiction of the courts of common pleas to render a valid judgment. *See Barclays Bank* at ¶ 14-23 (issuing a writ of prohibition against the Hamilton County Court of Common Pleas after finding that that court lacked subject-matter jurisdiction because of a lack of an adverse legal interest); *Bank of Am., N.A. v. Kuchta*, 2014-Ohio-4275, ¶ 17 (stating that subject-matter jurisdiction may be challenged at any time because a court that lacks subject-matter jurisdiction renders that court's judgment void ab initio). To hold that the justiciability requirement applies to courts of appeals is to add language to Article IV, Section 3 of the Ohio Constitution that does not exist. *See State ex rel. Taylor v. French*, 96 Ohio St. 172, 204 (1917) (stating that this court's duty is to "uphold and maintain the plain and explicit terms of the Constitution"); *Smith v. Leis*, 2005-Ohio-5125, ¶ 57 (noting that this court applies the same rules of construction in interpreting the Ohio Constitution and in construing statutes); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65, ¶ 286 (Fischer, J., dissenting) (stating that the omission of the phrase in one constitutional provision and the inclusion of the phrase in another constitutional provision supports the inference that the term left out must have been meant to be excluded). Thus, to determine the jurisdiction of the courts of appeals, we look at the requirements under Article IV, Section 3(B)(1) and (2) of the Ohio Constitution and the relevant statutory provisions governing appellate review, *see* R.C. 2505.02(B) (defining final orders); R.C. 2101.42 (granting courts of appeals jurisdiction to resolve questions of law in probate-court orders).

**{¶ 14}** Here, the fourth separate opinion does not deny that the probate court issued an order denying Adelaide's application to correct the sex marker on her birth certificate based on a lack of authority and that such an order would satisfy R.C. 2505.02 and/or 2101.42. The fourth separate opinion also does not contend that Adelaide was not an aggrieved party or that the issue surrounding her birth

7

certificate is barred by the mootness doctrine. *See State v. Bates*, 2022-Ohio-475, ¶ 20 (observing that a "party that benefits from an error cannot be the party aggrieved" on appeal); *M.R. v. Niesen*, 2022-Ohio-1130, ¶ 7 (noting that generally, courts do not decide moot issues). Thus, the Second District may have had (and probably did have) jurisdiction to review the *probate court's order* denying Adelaide's application. But without supplemental briefing, we may never know.

{¶ 15} The lack-of-adversity argument raised by the fourth separate opinion in relation to the probate court's jurisdiction still falls short of success. The General Assembly has the power to define the subject-matter jurisdiction of the courts of common pleas. *Ostanek v. Ostanek*, 2021-Ohio-2319, ¶ 3, citing Ohio Const., art. IV, § 4(B). Here, the General Assembly has provided that after a person applies for the correction of a birth record under R.C. 3705.15, "[t]he probate judge, if satisfied that the facts are as stated, shall make an order correcting the birth record." R.C. 3705.15(A). Thus, the General Assembly gave the probate court jurisdiction to order a correction of a birth record.

{¶ 16} As for an interest in the correction of Adelaide's birth record, the fourth separate opinion notes that there is no adversity here to satisfy the justiciability requirement because no party *claims* to have a competing interest. *See* separate opinion of Deters, J., at ¶ 102. But the fourth separate opinion fails to recognize that Ohio's state registrar may have a directly adverse interest in light of his or her duties under R.C. 3705.03(A)(1).

{¶ 17} Birth certificates are part of Ohio's statewide system of maintaining a record of vital statistics. *See* R.C. 3705.02, 3705.09, and 3705.15(D)(1). The General Assembly tasked the state registrar to head Ohio's office of vital statistics and "[a]dminister and *enforce*" the rules set forth in R.C. Ch. 3705. (Emphasis added.) R.C. 3705.03(A)(1). Since corrections of birth records are listed within R.C. Ch. 3705, *see* R.C. 3705.15(A), the state registrar has an interest in ensuring that applications to correct birth certificates are granted in accordance with the rule

pertaining thereto, i.e., applications to correct birth records that are supported with sufficient evidence are granted and applications to correct birth records that are not supported with sufficient evidence are denied, *see id.* (stating that an application to correct a birth record shall set forth all available facts required on a birth record and the reasons for making the application and the probate judge *shall* issue an order correcting the birth record if the judge is satisfied that the facts are as stated). To say that Ohio's state registrar completely lacks any interest in enforcing these rules is to read R.C. 3705.03(A)(1) as meaningless. *See State ex rel. Carna v. Teays Valley Local School Dist. Bd. of Edn.*, 2012-Ohio-1484, ¶ 19 (stating that courts should avoid any statutory construction that would render a provision meaningless or inoperative).

{¶ 18} Other provisions of R.C. Ch. 3705 also support the conclusion that the State generally has an interest in maintaining correct birth records. The General Assembly specifically noted that for an application for registration of an unrecorded, lost, or destroyed birth record, the applicant could be subjected to cross-examination by an interested person or by the prosecuting attorney of the county where the application was filed. R.C. 3705.15(B). If the State has an interest in an unrecorded, lost, or destroyed birth record, how does the State not have an interest in the *correction* of a birth record? Either the State has an interest in the correctness of this important legal document or it does not.

{¶ 19} To conclude that the State does not have an interest in maintaining and preserving correct birth records not only ignores R.C. 3705.03(A)(1), but it also seems illogical. This is apparent when we consider the implications of a birth certificate, especially for changes in sex markers and age. For example, Ohio has an interest in enforcing laws that relate to selective service, which applies only to men who are ages 18 to 25:

> In our judgment, Ohio has a legitimate interest, as does any state, in helping to promote the objectives of the federal government in providing for a common defense. To the extent that a military draft would be necessary to ensure the safety of our country, each of the several states has a considerable stake in the maintenance of a readily available national military force to protect the country and the interests of the individual states. Thus, encouraging selective service registration is not only a federal interest, but is also a basis for legitimate state concern.

*Klepper v. Ohio Bd. of Regents*, 59 Ohio St.3d 131, 133 (1991). If the State has a legitimate concern about encouraging selective-service registration, then would it not follow that the State has a legitimate concern about safeguarding the reliability of selective-service registration by ensuring the accurate reporting of information included on birth certificates? Additionally, the General Assembly has enacted laws impacting intercollegiate single-sex teams, including forbidding state institutions and private colleges from knowingly allowing persons of the male sex to participate on athletic teams or in athletic competitions designated for female-sex participants, R.C. 3345.562(C). There is an argument that the State would have some interest in maintaining correct birth certificates to ensure the proper enforcement of this law. Based on these two examples, it is at least arguable that the State has an interest in applications seeking to correct a birth certificate and that this interest would satisfy the justiciability requirement in Article IV, Section 4(B) of the Ohio Constitution.

{¶ 20} Further supporting the conclusion that the lower courts have jurisdiction to decide and review Adelaide's application to correct the sex marker on her birth certificate is this court's decision in *In re Bicknell*, 2002-Ohio-3615. In *Bicknell*, this court determined the merits of a similar matter—the validity of

legal-name changes under R.C. Ch. 2717. *Bicknell* at ¶ 1, 4, 18. In *Bicknell*, which was decided before same-sex marriage was recognized in Ohio, *see Obergefell v. Hodges*, 576 U.S. 644 (2015), a same-sex couple filed separate applications with a probate court to have their surnames changed in order to legally have the same surname, *Bicknell* at ¶ 1. Under R.C. Ch. 2717, the probate court could grant an applicant a legal-name change if the facts showed reasonable and proper cause for changing the name of the applicant. *See Bicknell* at ¶ 4-8. Though no party opposed the applications, the probate court nevertheless denied the applications because changing the surnames of a cohabitating couple would "'give an aura of propriety and official sanction to their cohabitation and would undermine the public policy of this state which promotes legal marriages and withholds official sanction from non-marital cohabitation.'" *Id.* at ¶ 2 (quoting the probate court's decision). This court reversed that judgment, finding that the couple evinced no criminal intent or fraudulent purpose in wanting to change their surnames and that they were not attempting to evade creditors or create the appearance of a state-sanctioned marriage. *Id.* at ¶ 18. If there was justiciability in *Bicknell*, then there certainly should be justiciability in the case at bar.

**{¶ 21}** But even assuming arguendo that *Bicknell* was wrongly decided because of a lack of justiciability at the probate-court level, we cannot reach the same conclusion here. The General Assembly provided that Ohio's state registrar "*shall* head the office of vital statistics *and* . . . [a]dminister and *enforce* [R.C. Ch. 3705], the rules issued under [R.C. Ch. 3705], and the instructions of the director [of health] for the efficient administration of the system of vital statistics." (Emphasis added.) R.C. 3705.03(A)(1). It is Ohio's state registrar who may have an adverse interest here since the registrar has an explicit duty to administer and enforce the rules pertaining to the correction of birth records.

**{¶ 22}** Under Article IV, Sections 3 and 4 of the Ohio Constitution and the various provisions of R.C. Ch. 3705, the fourth separate opinion's conclusion that

adversity is lacking in this case and that the Second District lacked jurisdiction to review the matter is unconvincing, at best. And without supplemental briefing by a party who may have an interest, this court may never know the many possibly important arguments on this subject.

### III. The merits of Adelaide's appeal

{¶ 23} Because this court declined the opportunity to order supplemental briefing to address adversity and because I find the fourth separate opinion's argument concerning adversity unconvincing, I will proceed to address the merits of this case. As discussed by the second separate opinion, the issue before us is whether the probate court has the authority under R.C. 3705.15 to grant Adelaide's application to correct the sex marker on her birth certificate. Separate opinion of Donnelly, J., ¶ 35, fn. 1. I agree with the second separate opinion that the probate court had no evidentiary basis and thus no authority to grant Adelaide's application, *see id.* at ¶ 46, and would therefore affirm the judgment of the court of appeals.

{¶ 24} The plain language of R.C. 3705.15 does not permit a probate court to grant an application to correct a sex marker on a birth certificate when the cause for the application arises from changes in fact or circumstance that occur *after* the applicant's birth. *See* separate opinion of Donnelly, J., at ¶ 40. R.C. 3705.15(A) allows a person born in Ohio whose registration of birth "has not been properly and accurately recorded" to file an application for "correction of the birth record" in the probate court, but the probate court may *grant* that application only "if satisfied that the facts are as stated" in the application and those facts demonstrate that the registration of birth "has not been properly and accurately recorded." Therefore, if the probate court finds that the facts demonstrate that the birth record was "properly and accurately recorded," then it has no authority to grant the application. *Id. Compare State v. Apanovitch*, 2018-Ohio-4744, ¶ 36 (a trial court has no authority to consider a postconviction petition if the petitioner has not satisfied the requirements in R.C. 2953.23(A)).

**{¶ 25}** The probate court, in determining whether the birth record was properly and accurately recorded, looks to the evidence provided by the applicant that demonstrates the person's sex at the time of birth because as discussed in the second separate opinion, the birth-registration process is focused on recording the event and the circumstances of the person's birth, separate opinion of Donnelly, J., at ¶ 40. Accordingly, any "correction" to a person's birth record would be limited to the circumstances and facts at the time of the person's birth. To hold otherwise would broaden the scope of R.C. 3705.15 and make irrelevant other statutes that allow for modifications of birth records because of circumstances that arise after a person's birth, *see id.* at ¶ 41; R.C. 3705.12 (new birth record issued for an adopted child); R.C. 3705.13 (changes to a birth record after a legal name change); R.C. 3111.13(A) and (B) and 3111.18 (new birth record issued if the judgment or order of a court determining the existence or nonexistence of a parent-and-child relationship is at variance with the child's birth record), and would therefore be contrary to our role in interpreting statutes, *see Boley v. Goodyear Tire & Rubber Co.*, 2010-Ohio-2550, ¶ 21 (the court should avoid construing a statute that renders a provision meaningless or inoperative). And despite the many policy concerns in this case, we cannot construe R.C. 3705.15 in a manner inconsistent with its plain language to right a perceived wrong. It is up to the General Assembly to decide whether to create any additional opportunities for persons born in Ohio to amend their birth records. *See Kaminski v. Metal & Wire Prods. Co.*, 2010-Ohio-1027, ¶ 61 (it is not the role of the courts to establish legislative policies). Therefore, I agree with the second separate opinion that the statutory scheme does not permit the correction of a sex marker on the birth certificate of a transgender person. *See* separate opinion of Donnelly, J., at ¶ 43.

**{¶ 26}** In this case, the lower courts reached the right result. The probate court denied Adelaide's application because her sex was properly and accurately recorded at the time of her birth, as demonstrated by her testimony that she was

born with male anatomy. And the Second District affirmed that decision. 2022-Ohio-2053 at ¶ 25, 27 (2d Dist.). Thus, like the second separate opinion, I would affirm the court of appeals' decision. *See* separate opinion of Donnelly, J., at ¶ 43.

## IV. Conclusion

{¶ 27} I respectfully disagree with the fourth separate opinion's proposed resolution of this case on the unbriefed issue that the matter before us lacks adversity and thus deprives the Second District Court of Appeals of jurisdiction to review the probate court's judgment denying Adelaide's application to correct the sex marker on her birth certificate. If we are to resolve this matter on the issue of adversity, first I would order supplemental briefing on the issue and request that the attorney general of Ohio and/or Ohio's state registrar file a merit brief or an amicus brief, because this issue may deeply implicate the subject-matter jurisdiction of many lower courts, require an analysis of the language of Article IV of the Ohio Constitution, and necessarily and directly affect Ohio's state registrar's interest in enforcing R.C. 3705.15(A).

{¶ 28} But if required to resolve the issue of adversity without supplemental briefing, which I believe would be a judicial error of a high order, based on my own research to date, I would hold that adversity is satisfied because Ohio's state registrar, as enforcer of the laws set forth in R.C. Ch. 3705 and the rules issued under that chapter, *see* R.C. 3705.03(A)(1), has an interest in ensuring that applications for the correction of birth records are granted or denied in accordance therewith.

{¶ 29} As for the merits of this case, I would hold that orders to correct birth records under R.C. 3705.15 are limited to the correction of errors arising from the circumstances and facts at the time of birth and R.C. 3705.15 thus does not permit probate courts to order the correction of the sex marker on a transgender person's birth record based on circumstances arising *after* that person's birth. I would therefore affirm the judgment of the Second District affirming the probate court's

judgment denying Adelaide's application to correct the sex marker on her birth certificate.

———————————

**DONNELLY, J., joined by STEWART, J., for affirming the court of appeals' judgment.**

{¶ 30} This appeal asks us a straightforward question of statutory interpretation: Does the statute governing applications to correct birth records give probate courts the authority to correct the sex marker on a transgender person's birth certificate? Today, this court answers that question by providing no answer at all. Four members of the court would reach the merits of the case—albeit coming to different conclusions on the statutory-interpretation question. *Compare* separate opinion of Fischer, J., ¶ 28-29 *with* separate opinion of Brunner, J., ¶ 92. But we are prevented from reaching the merits by the commitment of three justices to resolve this case on an untested and unconvincing procedural theory that concludes—in effect—that there is no case before us to resolve, because this appeal lacks adversity. *See* separate opinion of Deters, J., ¶ 109. This commitment has led to the court of appeals' judgment being left undisturbed, thereby depriving the litigant and amici in this case, the bench and bar, and the people of Ohio a definitive resolution to the issue before us. I believe that we should reach the merits of this case and that we should affirm the judgment of the Second District Court of Appeals. I write separately to explain my thinking.

*We should reach the merits of Adelaide's appeal*

{¶ 31} Hailey Emmeline Adelaide, a transgender woman, filed an application in the Clark County Probate Court to correct the sex marker on her birth certificate under R.C. 3705.15. The probate court denied Adelaide's application, concluding that the statute does not authorize the court to make the correction. Adelaide appealed to the Second District, which affirmed the probate court's judgment. 2022-Ohio-2053, ¶ 28 (2d Dist.). In reaching its decision, the appellate

court concluded that the text of R.C. 3705.15 allows probate courts to correct errors made at the time a birth was recorded but does not allow amendments to a birth certificate. *Id.* at ¶ 17-18. Adelaide appealed to this court, and we accepted jurisdiction to resolve whether the statute permits probate courts to change the sex marker on a transgender person's birth certificate as a correction to a birth record under R.C. 3705.15. *See* 2022-Ohio-3546.

{¶ 32} Rather than answer that question, Justice Deters would have this court announce a new rule of law: Ohio's appellate courts lack jurisdiction to decide appeals that lack adversity. *See* separate opinion of Deters, J., at ¶ 99-101, 109. The result advocated by Justice Deters flows from a strained analysis and is in spite of the reality that no party to this appeal is advocating for this new jurisdictional rule, that the issue of adversity was first raised in this case at oral argument by a justice of this court on his own volition based on his reading of a dissenting opinion from another jurisdiction's supreme court, and that this court has not received any briefing on the adversity issue from Adelaide or any other interested party that may be affected by this potential sea change in the law (such as the probate court or the State of Ohio).

{¶ 33} The other separate opinions explain at length why Justice Deters's approach is wrongheaded, and there is little more for me to add. I agree with Justice Fischer that it is a mistake for this court to announce a rule of law that changes the jurisdiction of Ohio's appellate courts, ostensibly by interpreting provisions of the Ohio Constitution, without seeking supplemental briefing on the adversity issue. *See* separate opinion of Fischer, J., ¶ 4-7. And while I am reluctant to answer whether adversity was necessary for Adelaide to invoke the jurisdiction of the court of appeals without the benefit of proper briefing on that issue, I find that the arguments set out in the separate opinions of Justice Fischer and Justice Brunner— that the Ohio Constitution, statutes, and caselaw do not impose that jurisdictional requirement—to be more convincing than Justice Deters's reasoning. *See id.* at

16

¶ 8-14; separate opinion of Brunner, J., ¶ 73-91. But even if adversity is a requirement for appellate jurisdiction in Ohio, I believe that the competing interests set out in Justice Fischer's separate opinion show that any such requirement has been satisfied. *See* separate opinion of Fischer, J., at ¶ 15-22.

{¶ 34} While resolving the issue of adversity likely warrants supplemental briefing, I believe the opportunity to call for that briefing has passed. This case has been under consideration for over a year, and Adelaide deserves a response to the questions she raised in her appeal. We have accepted jurisdiction over another case and stayed consideration of that case pending the resolution of this appeal. *See In re B.C.A.*, 2023-Ohio-4640. The bench, bar, and citizens of Ohio—to say nothing of Adelaide herself—are waiting for this court to decide whether R.C. 3705.15 allows probate courts to enter the sort of correction to a birth record that Adelaide requests. I would answer that question and conclude that the statute does not permit the correction.

*We should affirm the Second District's judgment because R.C. 3705.15 does not permit corrections to birth records arising from changes in fact or circumstance that occur after a person's birth*

{¶ 35} In her propositions of law, Adelaide asks us to interpret the language of R.C. 3705.15—the statute under which she asked the probate court to correct the sex marker on her birth certificate. The interpretation of the statutory language is, in many senses, the beginning and end of this case. Probate courts possess limited jurisdiction "and are permitted to exercise only the authority granted to them by statute and by the Ohio Constitution." *In re Guardianship of Hollins*, 2007-Ohio-4555, ¶ 11. Thus, for the probate court to provide Adelaide the relief she requests—the correction of the sex marker on her birth certificate—there must be a basis for that authority within the relevant statute. Adelaide argues that this court should broadly interpret the language in R.C. 3705.15 and conclude that the statute grants

the probate court the necessary authority to act. But several considerations undermine the interpretation Adelaide asks us to adopt.[1]

**{¶ 36}** When undertaking statutory interpretation, "our paramount concern is the General Assembly's intent in enacting the statute." *Stiner v. Amazon.com, Inc.*, 2020-Ohio-4632, ¶ 14, citing *State ex rel. United States Steel Corp. v. Zaleski*, 2003-Ohio-1630, ¶ 12. We perceive that intent by reading the statutory language in context and according to the rules of grammar and common usage. *State ex rel. Steele v. Morrissey*, 2004-Ohio-4960, ¶ 21.

**{¶ 37}** The relevant statute here does not expressly set out the probate court's authority to correct birth records. Rather, the grant of authority must be gleaned from the text that sets out the way in which a birth record may be corrected. R.C. 3705.15 permits a person born in Ohio and "whose registration of birth . . . has not been properly and accurately recorded" to "file an application for . . . correction of the birth record in the probate court" of the county of that person's birth or residence or of the county that the person's mother resided in at the time of the person's birth. The statute then explains what must be set forth in and included with the application and how the probate court is to consider and rule on the application, *see* R.C. 3705.15(A)—provisions that do not implicate the propositions of law Adelaide has raised here. Our focus, then, is on the statute's introductory text. That text provides that an applicant may file an application to "correct" registration information in a birth record that "has not been properly and

---

1. Justice Brunner's separate opinion asserts that "this case should not be characterized as concerning whether probate courts have the authority under R.C. 3705.15 to correct a sex marker on the birth record of a person who is transgender." Separate opinion of Brunner, J., at ¶ 68. Except that is exactly what this case is about. The probate court considered Adelaide's application to correct the sex marker on her birth certificate and found on the basis of the evidence provided, including Adelaide's testimony, that there was no correction for it to make. And because the statute permits only corrections, the probate court concluded it lacked jurisdiction to make the requested change. Whether the probate court possesses the authority to grant the relief that Adelaide seeks was the question before the court of appeals, *see* 2022-Ohio-2053 at ¶ 13 (2d Dist.). It is also the question before this court. And it is the question that this separate opinion seeks to answer.

accurately recorded." R.C. 3705.15. Adelaide argues that this language may be read broadly to encompass changes or amendments to information contained in a birth record, irrespective of whether that information is found to be in error. And that reading would be persuasive if the statute simply permitted the "correction" of birth records, without any further language. But the reading that Adelaide proposes ignores the statutory text as a whole. When the relevant language is read in its entirety, the application to the probate court must be to "correct" information that is not "properly and accurately recorded" in a birth record. *Id.* While recourse to a dictionary might be useful here, it isn't really necessary. The average English speaker would understand this statutory text as permitting persons to file applications seeking to correct information in a birth record that is improperly and inaccurately recorded. The statute's language is concerned with corrections that are meant to ensure the accuracy of the birth record. Thus, it is necessary to understand what it means for the information on the birth record to be properly and accurately recorded.

{¶ 38} To answer this question, it helps to look more broadly at what the Revised Code and other sources tell us about birth records and the information contained in those records. Broadly speaking, "[a] birth certificate is a document issued by a government that records the *birth of a child* for vital statistics, tax, military, and census purposes." (Emphasis added.) American Bar Association, *Birth Certificates* (Nov. 20, 2018), https://www.americanbar.org/groups /public_education/publications/teaching-legal-docs/birth-certificates/ (accessed Sept. 11, 2024) [https://perma.cc/43RW-9DGT]. In 1908, Ohio began requiring the prompt registration of births through the filing of certificates with the local registrar of the district in which the birth occurred; the law enacted by the General Assembly directed physicians and midwives to file a certificate of birth that included, among other information, the child's name, place of birth, sex, and legitimacy. S.B. No. 467, 99 Ohio Laws 296, 301-302; Thompson, *First Annual*

*Report of the Bureau of Vital Statistics* 39, 42-43 (1909), available at https://hdl.handle.net/2027/uiug.30112032545243 (accessed Sept. 17, 2024). Similar provisions are now found in R.C. Ch. 3705, which establishes the State's system of vital statistics. *See* R.C. 3705.02. Under R.C. 3705.09(A), a birth certificate for each live birth in Ohio must be filed in the registration district in which the birth occurred within ten calendar days after the birth. Except for requiring that all birth certificates "include a statement setting forth the names of the child's parents," R.C. 3705.08(B), the Revised Code does not set out the requirements of information that must be included on a birth certificate—delegating that power instead to the director of the Ohio Department of Health, *see* R.C. 3705.02 and 3705.08(A). And at the time of this separate opinion's drafting, the designated "certificate of live birth" form that the director has prescribed for use requires the child's name, time of birth, sex, date of birth, location of birth, county of birth, certain information regarding the parents, a certification from the attendant regarding the time, place, and date of birth, and the name of the facility where the birth took place to be included on the certificate. Adm.Code 3701-5-02(A)(1) and Appendix A.

{¶ 39} Neither the Revised Code nor the administrative rules state this directly, but both appear concerned with the prompt and accurate recording of the circumstances surrounding births as they are known at that time. For example, R.C. 3705.09(A) requires a birth certificate to be filed within ten days after the birth and requires the certificate to be registered if it has been completed and filed in accordance with R.C. 3705.09, making the information to be provided on the "certificate of live birth" form subject to what is known and available at the time of the birth being registered. In short, the birth certificate provides a snapshot of an event, the description of a moment, as it was then understood.

{¶ 40} Because the birth registration is focused on recording the event and the circumstances of a person's birth, it follows that the provisions of R.C. 3705.15

20

are concerned with correcting information on the birth record that was not correctly recorded at the time of the birth.  Put more simply, R.C. 3705.15 is not concerned with corrections arising from changes in fact or circumstance that occur after the birth.  Rather, the statute seeks to ensure the accurate registration of birth records by providing a mechanism to replace improperly and inaccurately recorded information about the birth with the correct facts or information as they were known when the person was born.

{¶ 41} This understanding of the statute is bolstered by the broader statutory scheme in which R.C. 3705.15 is found.  Other statutes permit the modification of birth records to reflect reality as it exists *after* a person's birth.  For example, R.C. 3705.12 permits the issuance of a new birth record following the adoption of a child that includes "the child's adopted name and the names of and data concerning the adoptive parents."  R.C. 3705.13 allows for the change of birth records to reflect a legal name change.  Accepting for the sake of argument Adelaide's assertion that the language of R.C. 3705.15 is not ambiguous, it is inappropriate to use the in pari materia rule of statutory construction.  *See Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 2014-Ohio-5511, ¶ 22 (courts may read related statutes in pari materia and construe them together when determining the meaning of ambiguous statutory language).  But we do assume that the General Assembly is "aware of other statutory provisions concerning the subject matter of the enactment even if they are found in separate sections of the Code."  *Meeks v. Papadopulos*, 62 Ohio St.2d 187, 191-192 (1980).  That the General Assembly has created mechanisms to change birth records to correspond to facts occurring after the birth has occurred gives rise to an understanding that the legislature did not intend for the correction procedure set out in R.C. 3705.15 to cover those situations.  Thus, I believe the context of R.C. 3705.15 within the broader statutory scheme supports interpreting the statute's text in a limited way.

**{¶ 42}** Finally, the history of the statutory scheme gives this court some clue as to the purpose underpinning R.C. 3705.15, which in turn may inform our understanding.[2]   While the text of a statute is a court's primary source when discerning a provision's meaning, it should be remembered "that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).   In Ohio, a statewide law went into effect in 1867, requiring each county's probate court to record births that occurred in that county.  Ohio History Connection, *Birth Records*, https://ohiohistory.libguides.com /vital/birthrecords (accessed Sept. 12, 2024) [https://perma.cc/YWB6-54DZ]. Then, as discussed above, the registration of births with the Bureau of Vital Statistics through the filing of birth certificates became part of the Revised Statutes of Ohio in 1908.  Both the text of the act enacted in 1908 and the contemporary commentary show that the General Assembly was concerned with the accurate recording of births in the State.  S.B. No. 467, 99 Ohio Laws at 301-302; Thompson at 42-43, 49.  Given the history and purpose of this statutory scheme, it does not follow that the scheme was intended to provide the relief Adelaide requests.  The legislature sought to create a system for the accurate recording of birth records, so it makes sense that the statutory scheme promulgated by the General Assembly includes a provision for correcting only those records that are inaccurate.  Thus,

2. Justice Brunner's separate opinion opines that using the statute's history as a method of understanding its language and text does not help resolve the questions Adelaide has presented.  And in support of its own position, that separate opinion relies on the analysis used in a federal case. Separate opinion of Brunner, J., at ¶ 69, citing *Ray v. McCloud*, 507 F.Supp.3d 925, 938 (S.D.Ohio 2022).  The decisions of federal district courts are not binding on this court and provide only persuasive authority. *See State v. Burnett*, 2001-Ohio-1581, ¶ 16.  In *Ray*, the federal district court was not engaging in statutory interpretation, as the parties in this case ask us to do.  Rather, the discussion in *Ray* cited in Justice Brunner's separate opinion  was addressing whether the State's interest in historical accuracy was a sufficient interest for a *policy* of the Ohio Department of Health to survive *intermediate scrutiny* under a federal equal-protection analysis.  *Ray* at 937-938.  That has nothing to do with this court's independent duty and authority to interpret Ohio's statutory law. Thus, *Ray* is of limited persuasive value here.

22

one may imagine the General Assembly as understanding the provision now codified as R.C. 3705.15 as allowing for correction of clerical errors or even substantive corrections like the addition of a father's name after the birth. But those corrections relate to the circumstances of the birth as understood to exist at the time the birth occurred and ensure the accuracy of the recorded information. What is more, our understanding of gender and sexuality has changed considerably since the beginning of *this* century, let alone the beginning of the previous one. And while I do not question the lived experience of those persons who, like Adelaide, find themselves born in a body whose biological sex does not correspond to their understanding of their gender identity, I do not believe that the purpose of the statutory scheme at issue here was intended to cover the relief Adelaide requests.

{¶ 43} In sum, the text, structure, history, and purpose of R.C. 3705.15 and its companion statutes lead me to conclude that the statutory scheme does not permit the correction of a sex marker on the birth certificate of a transgender person. This, in turn, means that there is not a statutory grant of authority to probate courts to hear applications to correct birth certificates on this basis. The Second District reached this conclusion and affirmed the probate court's denial of Adelaide's application to correct the sex marker on her birth certificate. 2022-Ohio-2053 at ¶ 16-19, 28 (2d Dist.). Thus, I would affirm the court of appeals' decision.[3]

### *The General Assembly should address this gap in Ohio's law*

{¶ 44} It is an oft-repeated refrain in my writing that the law is the law, and that jurists must apply the law even if that application leads to odious or unjust results. *See State v. Bortree*, 2022-Ohio-3890, ¶ 20; *State ex rel. Mobarak v. Brown*, 2024-Ohio-221, ¶ 21 (Donnelly, J., concurring in judgment only). And that bears repeating here. I take no joy in reaching the conclusion that R.C. 3705.15

---

3. I acknowledge that this reading of the statute might carry constitutional implications that may require further adjudication. But the constitutionality of the statute is not squarely before the court in this case and, as a result, is outside the scope of this separate opinion.

does not permit the probate court to correct the sex marker on Adelaide's birth certificate to reflect who she knows herself to be. Transgender persons are our fellow citizens, they are our neighbors and friends, and they contribute to our communities and this State. They are entitled to respect, equal treatment, and the ability to live their lives as they see fit. However, as it stands now, the statutory scheme concerning the correction of birth records could be interpreted as denying transgender persons these rights.

{¶ 45} The General Assembly has enacted other statutes permitting the amendment of a birth certificate to incorporate realities that were not present or obvious at the time of a person's birth—like adoption in R.C. 3705.12. It should enact a statute creating a mechanism by which transgender persons born in Ohio may seek a change of the sex marker on their birth certificates to show, officially, who they know themselves to be. In my mind, this is not simply a question of policy but a matter of justice.

*Conclusion*

{¶ 46} I am unconvinced by the analysis in Justice Deters's separate opinion that would result in this court reversing the court of appeals' judgment on procedural grounds. And my conclusion on the substantive statutory-interpretation question is different than that reached by Justice Brunner. In sum, I would reach the merits of Adelaide's appeal and affirm the judgment of the Second District Court of Appeals because R.C. 3705.15 does not give probate courts the authority to correct the sex marker on a transgender person's birth certificate.

————————————

**BRUNNER, J., for reversing the court of appeals' judgment and remanding the cause to the probate court.**

{¶ 47} I am disappointed in the other separate opinions in this case concluding that appellant, Hailey Emmeline Adelaide, either has no right to apply for a correction of her birth record under R.C. 3705.15 or no right to appeal the

24

probate court's judgment denying her application to correct her birth record. This case can and should be easily resolved by looking at the plain language of R.C. 3705.15, which confers authority on probate courts to correct a sex marker on the birth record of *any person*. R.C. 3705.15(A) ("Whoever claims to have been born in this state, and whose registration of birth . . . has not been properly and accurately recorded, may file an application for . . . correction of the birth record in the probate court . . . .").

{¶ 48} One separate opinion, held by three members of the court, concludes that Adelaide's appeal requires an adverse party and must be dismissed because it lacks such adversity. The separate opinion advancing this theory, one that has not been briefed by Adelaide or the 26 amici that have appeared this case, claims that the requirement for adversity has "long been understood" and therefore Adelaide's appeal should be dismissed by the Second District Court of Appeals. Separate opinion of Deters, J., ¶ 100, 109. Another separate opinion would seek briefing on the issue of adversity, in a show of commendable caution, *see* separate opinion of Fischer, J., ¶ 4-7, but then concludes that the tepidly erroneous decisions issued by the lower courts in this matter should be affirmed, *id.* at ¶ 23-26. And yet another separate opinion would dispense with any further briefing and affirm the decisions below. Separate opinion of Donnelly, J., ¶ 34. I respectfully disagree with each of these approaches.

{¶ 49} Viewing the separate opinion in favor of vacating the court of appeals' decision based on the lack of adversity, the question remains: If this theory of adversity is so well established, then why is the separate opinion advancing it relying on cherry-picked statements of law from centuries past that have no bearing on the type of application that Adelaide filed in a county probate court in Ohio? The separate opinion cites, for example, William Blackstone's 1768 *Commentaries on the Laws of England* as authority for what constitutes a judicial proceeding, separate opinion of Deters, J., at ¶ 100, but it ignores Blackstone's recognition of

ecclesiastical courts, which had "*voluntary*" and not "*contentious*" jurisdiction over matters (emphasis in original), 3 William Blackstone, *Commentaries on the Laws of England* 66, 98 (1768).

{¶ 50} And if adversity is so necessary to judicial power in Ohio, then the separate opinion advancing an adversity theory should find support for excluding appeals such as Adelaide's from our jurisdiction not under the United States Constitution, but under Article IV of Ohio's Constitution establishing the state's judiciary. The separate opinion in question explains that Article III, Section 2 of the United States Constitution reflects the need for adversity, because that provision uses the word "controversies." Separate opinion of Deters, J., at ¶ 100. But the Ohio Constitution does not include this language, and Ohio's courts are not bound by principles derived from the federal Article III, *see State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 1999-Ohio-123, ¶ 32 ("federal decisions [applying Article III] are not binding upon this court"). Even if federal Article III principles were relevant here, the United States Supreme Court has explained that "adversarial presentation" is a "prudential concern[]," one that may actually demand the court's attention rather than dismissal of an action, *United States v. Windsor*, 570 U.S. 744, 761 (2013) ("In these unusual and urgent circumstances, the very term 'prudential' counsels that it is a proper exercise of the Court's responsibility to take jurisdiction.").

{¶ 51} We have decided matters on a lack of adversity theory in the past. *See, e.g.*, *In re Jane Doe 1*, 57 Ohio St.3d 135, 136 (1991) (affirming a judgment dismissing an application for judicial bypass); *In re Bonfield*, 2002-Ohio-6660, ¶ 36, 50 (finding a juvenile court had jurisdiction to consider a shared-parenting agreement between a same-sex couple); *In re Bicknell*, 2002-Ohio-3615, ¶ 18 (reversing a probate court's denial of two name-change applications). Try as it may to discuss two of these cases in the context of this questionable theory, *see* separate opinion of Deters, J., at ¶ 105, the separate opinion advancing the adversity theory

ignores the fact that no other party or interest was necessary to resolve the legal questions presented in those cases.

{¶ 52} Instead of reaching the merits of the question whether R.C. 3705.15 provides the probate court with the authority to change the sex[4] marker on Adelaide's birth certificate, the adversity-theorized separate opinion asks a question not posed here, one which was first devised by a justice of this court during oral argument in this matter, spotlighting to one of likely first impression in this court. The other two separate opinions point out that it is improper for this court to proceed under Justice Deters's separate opinion's adversity theory without any briefing, argument, or illustrative debate that could help shape the contours of arguments according to this only-one-party rejection theory. *See* separate opinion of Fischer, J., at ¶ 4-7; separate opinion of Donnelly, J., ¶ 33; *see also Windsor* at 761.

{¶ 53} Today's multiplicity of separate opinions in a single case with no majority opinion and with a separate opinion held by three members of this court that is based on a theory that was not raised in the briefs leaves a chasm of unanswered questions for Ohioans seeking review of important decisions obtained through noncontentious proceedings. First and foremost, this court unfairly raises but fails to give Adelaide the opportunity to brief the theory of adversity in determining whether probate courts have the authority to grant the relief that Adeliade seeks. Thus, we have raised but not answered these questions: Do applicants in noncontentious proceedings have a right to appellate review at all? If there is no right to appeal a noncontentious final order, is extraordinary relief available? And more importantly, may the probate courts of this State grant or deny

---

4. In accordance with Sup.R. 51, this court publishes standard forms for uniform use in Ohio's probate courts. Adelaide used one of these forms—Probate Form 30.0—to apply to correct her birth record.

Probate Form 30.0 includes ten boxes that correspond to the information that may be corrected on a birth record. While R.C. 3705.15 does not specifically refer to "gender" or "sex," Probate Form 30.0 includes box No. 4, which uses the term "[s]ex." Therefore, that term is used throughout this opinion.

an application to correct a sex marker on a birth record when the applicant attests that the marker is incorrect? Will this court allow the philosophies of individual judges from county to county determine the scope of Ohio's birth-record-correction statute? Persons like Adelaide are the casualties of this fractured decision we issue today. Though it is this court's duty to state what the law is, we have failed in that duty and deny Adelaide and others who similarly petition the government clarity on how to apply R.C. 3705.15 to such petitions.

{¶ 54} The heart of the matter is that the legal issues presented in Adelaide's appeal can and should be decided. Moreover, resolution of these issues weigh in her favor. Courts are not permitted to read an exception into a generally applicable statute, no matter how the facts of the case are perceived. If the General Assembly chose not to include an exception in R.C. 3705.15 for correcting a sex marker on a birth certificate, courts may not create one. *See Bostock v. Clayton Cty., Georgia*, 590 U.S. 644, 669 (2020). This is especially so when the judicially created exception would discriminate against persons who are transgender, a quasi-suspect class of persons that is entitled to heightened protection under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, *see Ray v. McCloud*, 507 F.Supp.3d 925, 937 (S.D.Ohio 2020).

{¶ 55} I therefore offer this separate opinion favoring reversing the court of appeals' judgment and remanding Adelaide's case to the probate court.

### I. Background

{¶ 56} In October 2021, in accordance with R.C. 3705.15, Adelaide filed two applications for correction of her birth record using Probate Form 30.0 in the Clark County Probate Court. Adelaide sought to correct the items in box No. 1 of the form, concerning "Full Name of Child," and box No. 4, concerning "Sex."

{¶ 57} Shortly before her applications were filed, in August 2021, this court modified Probate From 30.0, *see* 2021-Ohio-2800 (administrative action indicating that amendments to Probate Form 30.0 were adopted August 3, 2021). The

28

modification of this form followed the decision in *Ray*, 507 F.Supp.3d 925. In that case, the United States District Court for the Southern District of Ohio explained:

The Ohio Revised Code permits a person to correct a birth record that, among other things, "has not been properly or accurately recorded." Ohio Rev. Code § 3705.15. No portion of the Ohio Revised Code prohibits using § 3705.15 to change the sex marker on a birth certificate. Other portions of Ohio's statutory scheme governing vital statistics permits changes to a birth certificate to reflect adoptions and legal name changes. *See* Ohio Rev. Code §§ 3705.12, 3705.13.

Indeed, prior to 2016, [Ohio officials] permitted transgender individuals born in Ohio to change the sex marker on their birth certificates, if the transgender individuals obtained a court order, paid a processing fee, and completed an [Ohio Department of Health ("ODH")]-provided form. . . . At least ten transgender people born in Ohio successfully obtained sex-corrected birth certificates prior to 2016.

Sometime in 2015, after consultation with ODH in-house counsel and the Ohio Governor's office, ODH "re-reviewed" its birth certificate policy . . . and decided to no longer permit changes to the sex marker on Ohio birth certificates when the basis for that change was that the person was transgender. . . . Ohio continues to permit other changes to birth certificates (such as for adoption and legal name) as well as alterations to the sex field if the basis for the request is a mistake or where the physician observed atypical genitalia and records the sex as "U" for "undetermined" at birth.

(Footnote omitted.)    *Ray* at 929.    The federal court invalidated Ohio's administrative policy of denying requests of transgender persons to correct the sex markers on their birth certificates, finding no rational basis for the discriminatory policy.  *Id.* at 939-940.

{¶ 58} Using Ohio's statutory scheme, specifically R.C. 3705.15, Adelaide submitted her application for correction of her birth record, which included her own affidavit and an affidavit and letter from her mental-health-care provider.  The letter attested to Adelaide's female sexual identity "both psychologically and in lifestyle gender expression."  The probate court conducted a hearing and granted Adelaide's request to correct her name, but regarding Adelaide's request to change her sex marker, the court permitted Adelaide's counsel to provide additional briefing on whether the sex marker could be changed.

{¶ 59} In its order denying Adelaide's application to correct the sex marker, the probate court framed the issue as whether it had the statutory authority to grant Adelaide's application to change her sex marker.  The probate court noted that other probate courts in the State had addressed the issue in different ways.  The probate court acknowledged the conclusion in *Ray* that nothing in the Ohio Revised Code prohibits Ohio's probate courts from using R.C. 3705.15 to correct a sex marker.  But the probate court nonetheless reasoned that the court in *Ray* did not point to any authority of Ohio's probate courts to grant the relief Adelaide requested.  The probate court concluded that *Ray* was about the ODH's blanket prohibition on transgender persons' using R.C. 3705.15 to change their sex markers, and it found the construction of R.C. 3705.15—not an ODH policy—to be the central issue.  The probate court further found that because the initial recording of Adelaide's sex marker as male aligned with the fact that she was born with biologically male anatomy and because her current physical anatomy supported the determination of "male" as the sex marker on her birth certificate, there was nothing to be "corrected" regarding Adelaide's birth record under R.C. 3705.15.

30

{¶ 60} Adelaide appealed the probate court's judgment to the Second District, arguing that the probate court erred by giving no persuasive weight to the constitutional rulings of the court in *Ray*. She also argued that based on the record and the plain language of R.C. 3705.15, she was entitled to a corrected sex marker on her birth record. The Second District conducted a de novo review of the question of law presented. 2022-Ohio-2053, ¶ 10 (2d Dist.). The court of appeals did not question its jurisdiction or ask for any supplemental briefing concerning whether it could hear the appeal.

{¶ 61} The court of appeals concluded that R.C. 3705.15 permits only "corrections" of birth records that were not "'properly and accurately recorded'" at the time of birth. *Id.* at ¶ 16-17, quoting R.C. 3705.15. It found that Adelaide was actually requesting an "amendment" to her birth record, *id.* at ¶ 17, 27, and that the legislature did not expressly authorize the probate court "to modify the birth certificate to correlate with a later-in-life change," *id.* at ¶ 19. The court of appeals affirmed the probate court's judgment, finding that all evidence suggested that Adelaide was born with male genitalia and that the gender identification made at the time of her birth was correctly recorded. *Id.* at ¶ 25.

{¶ 62} On August 1, 2022, Adelaide appealed to this court, and on October 11, 2022, we accepted the appeal for discretionary review. *See* 2022-Ohio-3546. Adelaide filed her merit brief in December 2022. Twenty-six amici appeared in this case, and three separate amici briefs in support of Adelaide's position were filed. Oral argument was held in April 2023, and counsel for Adelaide appeared and argued her position. Now, after this case has been pending before this court for over two years, this court is issuing a decision that raises gratuitous questions and fails to provide answers.

## II. R.C. 3705.15 authorizes the probate court to grant Adelaide's application

{¶ 63} In this case, we are asked to perform the routine task of interpreting a statute. That statute, R.C. 3705.15, permits "[w]hoever claims to have been born

in this state, and whose registration of birth . . . has not been properly and accurately recorded, [to] file an application for . . . correction of the birth record." The applicant, whoever that may be, must state and verify "all of the available facts required on a birth record and the reasons for making the application." R.C. 3705.15(A). If the probate court finds "that the facts are as stated," then it "*shall* make an order correcting the birth record." (Emphasis added.) *Id.*

{¶ 64} Some probate courts and appellate courts seem to have been perplexed about processing applications filed by persons who are transgender and who seek to correct the sex marker on their birth certificates under R.C. 3705.15. Courts throughout the State have spent a great deal of time and effort debating the definition of the term "correction" in the statute. *See In re B.C.A.*, 2023-Ohio-2931, ¶ 13 (11th Dist.); *In re Carpenter*, 2024-Ohio-810, ¶ 14 (5th Dist.). The separate opinion supported by two members of the court suggests that the General Assembly should enact a statute to afford Adelaide the relief that she seeks, *see* separate opinion of Donnelly, J., at ¶ 45, and it raises a concern that under the current version of R.C. 3705.15, a probate court cannot "correct" an applicant's birth certificate when the applicant's assigned gender at birth cannot be shown to have been inaccurately recorded at the time the information on the birth record was initially filed, just after birth, *see id.* at ¶ 40. Parallel to this sentiment, this same opinion and another separate opinion find that the language in R.C. 3705.15 does not permit the correction of a birth record when the cause for the correction is a change in fact or circumstance arising after the applicant's birth. Separate opinion of Fischer, J., at ¶ 24, citing separate opinion of Donnelly, J., at ¶ 40. Problems exist when the statute is read either way.

{¶ 65} First, framing the issue as whether R.C. 3705.15 may be used by persons who are transgender to apply to correct the sex markers on their birth certificates has the effect of discriminating without a rational basis between cisgender and transgender persons. R.C. 3705.15 does not distinguish between

cisgender and transgender persons. Prohibiting only persons who are transgender from using the statute to correct the sex marker on their birth certificates is unconstitutional. *See Ray*, 507 F.Supp.3d at 934-940. Thus, if R.C. 3705.15 allows *anyone* to apply to correct a sex marker on a birth certificate, then by its very terms it allows *everyone* to apply to correct a sex marker under the same terms. *See Bibb v. State Med. Bd.*, 2024-Ohio-1928, ¶ 13 (Kennedy, C.J., concurring in part and dissenting in part), quoting *State v. Wells*, 146 Ohio St. 131, 137 (1945) ("'"Any person" means *every* person'" [emphasis added in *Wells*]).

{¶ 66} Second, the statute vests probate-court judges with the authority to determine whether an applicant's birth certificate was properly and accurately recorded and whether the facts required on the birth record are as stated. *See* R.C. 3705.15(A) ("An application to correct a birth record shall set forth all of the available facts required on a birth record and the reasons for making the application, and shall be verified by the applicant. . . . The probate judge, if satisfied that the facts are as stated, shall make an order correcting the birth record . . . ."). This authority does not change when the person filing the application states that they are transgender.

{¶ 67} Although two separate opinions of this court view the purpose of birth records as maintaining a record of information from the time of a person's birth, *see* separate opinion of Fischer, J., at ¶ 25; separate opinion of Donnelly, J., at ¶ 40, there are no temporal constraints in a plain reading of R.C. 3705.15. Birth records often communicate information about events that occur after a person's birth. *See* R.C. 3705.12 (issuance of new birth record to reflect new information about a child and the adoptive parents after an adoption); R.C. 3705.13 (issuance of new birth certificate after a legal name change); *see also* Probate Form 30.0 (identifying ten boxes of data that may be "corrected or added" on a birth record). The separate opinion of Fischer, J., at ¶ 25, suggests that if R.C. 3705.15 allows for modifications of birth records based on circumstances and facts that arise *after* a

person's birth, then other statutes that allow for changes to birth records due to later-in-life events would be made "irrelevant." And the separate opinion of Donnelly, J., at ¶ 41, finds the "broader statutory scheme" supports limiting the use of R.C. 3705.15 to correcting only errors made in the recording of information *at the time of* a person's birth. But the statutes referenced in these separate opinions— R.C. 3705.12, R.C. 3705.13, R.C. 3111.13(A) and (B), and R.C. 3111.18—provide a process for *updating* a birth record following a specific type of legal proceeding (such as a legal name change or an adoption). R.C. 3705.15 is a catchall provision that allows for general corrections of the "facts required on a birth record." R.C. 3705.15(A). And just like the other statutes referenced in these separate opinions, R.C. 3705.15(D)(1) provides a similar process for *updating* a birth record after the correction is ordered. Reading the statutes in this manner does not render them incompatible. Whether a birth record has been properly and accurately recorded and whether the facts required on the birth record are as stated by the applicant are factual determinations that are subject to abuse-of-discretion review by appellate courts. *See In re Application for Correction of Birth Record of Lopez*, 2004-Ohio-7305, ¶ 29 (5th Dist.). That there are numerous ways in which a person's assigned gender at birth may not be properly and accurately recorded on that person's birth record is demonstrated by academic discussion on the subject:

> In cases in which an infant's sex is not readily apparent to clinicians, assignments are made based on factors including chromosomes, hormones, gonads, and genitalia, considering how the child's body will develop at puberty, their future fertility, and what sorts of "somatic traits and configurations clinicians believe are necessary (or even allowed) to be male or female."

34

Jessica A. Clarke, *Sex Assigned at Birth*, 122 Colum.L.Rev. 1821, 1835-1836 (2022), quoting Katrina Karkazis, *Fixing Sex: Intersex, Medical Authority, and Lived Experience* 94 (2008). Even if a birth record is deemed to have been properly and accurately recorded at the time of birth, R.C. 3705.15 does not limit the ways in which a probate court may find that at the time an application for correction of a birth record is filed, the birth record has not been properly and accurately recorded.

{¶ 68} To be clear, this case should not be characterized as concerning whether probate courts have the authority under R.C. 3705.15 to correct a sex marker on the birth record of a person who is transgender, because the plain language of the statute confers authority on probate courts to correct a sex marker, period. *See Bostock*, 590 U.S. at 669 ("when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule"). Absent language in R.C. 3705.15 or another law that would prohibit the probate court from granting Adelaide's application, no court may read such an exception into the statute, nor should it. *See State v. Smith*, 2022-Ohio-274, ¶ 27 ("it is beyond our authority to read words into a statute that were not put there by the legislature"). This is especially so when such a judicially created exception would place the constitutionality of the statute in jeopardy. *See* R.C. 1.47(A) (it is presumed that "[c]ompliance with the constitutions of the state and of the United States is intended" in enacting a statute); *see also George v. Mann*, 29 Ohio N.P.(N.S.) 371, 374 (C.P. 1932) ("It is an elementary principle of statutory construction that where two constructions may be given to a statute, one of which will render the statute unconstitutional and the other constitutional, that construction, if it can reasonably be made, will be given to the statute which will render the same constitutional.").

{¶ 69} The historical and statutory context of recording birth records in Ohio does not support selectively applying R.C. 3705.15, as is suggested in other separate opinions in this case, *see* separate opinion of Fischer, J., at ¶ 25; separate opinion of Donnelly, J., at ¶ 38. Moreover, the historical context shows that the

*contents* of birth certificates was not prescribed by the legislature but, rather, delegated to the Ohio Department of Health. *See* separate opinion of Donnelly, J., at ¶ 38. This is why in *Ray*, the plaintiffs challenged the policy implemented by the department that prevented changes to the sex marker on the birth certificates of persons who are transgender but did not challenge R.C. 3705.15 directly, *see Ray*, 507 F.Supp.3d at 929. Even so, State officials framed the issue as an interpretation of R.C. 3705.15, *Ray* at 929, fn. 4, and argued that the State of Ohio had a substantial interest in the accuracy of Ohio's birth records, *id.* at 938. The district-court judge in *Ray* found this argument to be undermined by Ohio law that permits the changing of a parent's name on a birth certificate to reflect an adoption, and State officials could not explain why that kind of change did not affect the accuracy of the birth record but changing the sex marker did. *Id.* The *Ray* court found that

> the idea that the State of Ohio has a true interest in maintaining historically accurate records is undermined by the fact that Ohio permitted transgender people to change the sex marker on their birth certificates until 2016. [State officials] have offered no evidence to explain why "historical accuracy" has only recently become a State interest, or why it was necessary to change its Policy to further that interest.

*Id.*

{¶ 70} Following the *Ray* decision, the Ohio Department of Health updated its website to explain its compliance with the federal court's order. The website now reads, "In order to comply with the court decision in *Ray v. McCloud*, Case # 2:18-cv-00272, the Ohio Department of Health will make changes to the sex marker on a birth certificate with a probate court order." Ohio Department of Health, *Changing or Correcting a Birth Record*, https://odh.ohio.gov/know-our-

programs/vital-statistics/changing-correcting-birth-record (accessed Oct. 7, 2024) [https://perma.cc/X5AG-2JMQ]. Additionally, this court adopted a uniform application—Probate Form 30.0—that could be used in probate courts throughout the State to obtain a court order to correct a sex marker on a birth record. *See* 2021-Ohio-2800. Similar to what the federal court in *Ray* found regarding the Ohio Department of Health's actions in changing course without explanation, the separate opinions of my colleagues today run counter to this court's prior implementation of *Ray* in its supervisory role of the courts of this State—allowing any person to apply for a correction of the sex marker on the person's birth record with a uniform application for a probate-court order that, once granted, can be presented to the department for a new birth record to be prepared using the correct information in accordance with R.C. 3705.15(D)(1).

{¶ 71} Assuming arguendo that the purpose of R.C. 3705.15 is to preserve a "snapshot" of the information at the time of birth, separate opinion of Donnelly, J., at ¶ 39, the federal court in *Ray* explained that that was not always true historically, *Ray* at 929. This court should not parse or prescribe what is the purpose or even how to achieve the purpose of R.C. 3705.15. The General Assembly's words are its words, and the plain meaning of them in R.C. 3705.15, without equivocation, is that birth certificates may be corrected when they are not properly and accurately recorded.

{¶ 72} The probate court was given the authority under R.C. 3705.15(A) to make an order correcting Adelaide's birth record, which includes correcting the sex marker on her birth certificate. Because the probate court concluded that it does not have the authority, I would remand the matter to the probate court, ordering it to perform its duties under R.C. 3705.15 and process Adelaide's application.

### III. Appellate courts should not question their ability to adjudicate noncontentious appeals

#### A. *Adversity is not a jurisdictional requirement in Ohio*

{¶ 73} Because the separate opinion advancing an adversity theory does so without the benefit of briefing, I find it important to explain the problems and dangers of entertaining or even implementing such a theory.

{¶ 74} The separate opinion advancing an adversity theory does not explain what it means when it says that the appellate court lacked "the judicial power" over Adelaide's appeal. Separate opinion of Deters, J., at ¶ 94. The term "judicial power" is generally used in referring to a court's exercise of its authority. *See* Ohio Const., art. IV, § 1 ("The judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the supreme court as may from time to time be established by law."). Because the separate opinion advancing an adversity theory speaks in terms of Adelaide's ability to "*invoke* the judicial power of the court of appeals or this court" (emphasis added), separate opinion of Deters, J., at ¶ 104, it appears the separate opinion is referring to the appellate court's jurisdiction.

{¶ 75} Courts in Ohio have the power to determine their own jurisdiction, *see Smith v. Ohio State Univ.*, 2024-Ohio-764, ¶ 28 (Brunner, J., dissenting), citing *State ex rel. Ohio Bur. of Workers' Comp. v. O'Donnell*, 2023-Ohio-428, ¶ 8, although it is not uncommon for parties and courts to debate and determine the propriety of a court's jurisdiction before reaching the merits of a case, *see, e.g.*, *id.* And courts routinely raise the question sua sponte. *See, e.g.*, *Preterm-Cleveland v. Yost*, 2022-Ohio-4540, ¶ 8 (1st Dist.) ("this court sua sponte raised a question regarding appellate jurisdiction"). The court of appeals never questioned its own authority when it heard Adelaide's appeal, and correctly so.

{¶ 76} The separate opinion advancing an adversity theory cites no law or constitutional provision that requires adversity to invoke the jurisdiction of Ohio's

appellate courts. Ohio's courts of appeals derive their "judicial power" from Article IV, Section 3(B)(2) of the Ohio Constitution, which confers jurisdiction to those courts "as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district." Moreover, the General Assembly has provided the right to appeal probate-court judgments and has set forth statutory criteria for determining when an order constitutes a final, appealable order. *See* R.C. 2101.42 and 2505.02. Neither of these provisions prevented the court of appeals from deciding the issues presented in Adelaide's appeal.

**{¶ 77}** R.C. 2101.42 provides for appellate review of "any final order, judgment, or decree of the probate court" on questions of law and in the same manner as appeals from the general division of the court of common pleas. A "final order" is defined in R.C. 2505.02(B)(2) as "[a]n order that affects a substantial right made in a special proceeding." R.C. 2505.02(A)(1) provides that a "substantial right" is a right that is protected or enforced under a statute, such as R.C. 3705.15. And "special proceeding" is defined as "an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity." R.C. 2505.02(A)(2); *see In re Estate of Wyckoff*, 166 Ohio St. 354, 358 (1957), quoting *Schuster v. Schuster*, 84 Minn. 403, 407 (1901) ("'Where the law confers a right, and authorizes a special application to a court to enforce it, the proceeding is special, within the ordinary meaning of the term "special proceedings."'").

**{¶ 78}** The core principle for appellate review in the Ohio Constitution and these enabling statutes is finality, not adversity. *See* Michael L. Buenger, *Ohio Appellate Practice Before and After* Polikoff*: Are Things Really All That Much Clearer?*, 28 Akron L.Rev 1, 4 (1994) ("In Ohio, the requirement of finality before appeal is so strong that there is arguably no appeal of an interlocutory order."). There is nothing in these provisions of law that would lead to even an inference that

adverse parties or interests are necessary to institute an appeal. Therefore, the Second District's appellate review was well within its jurisdiction under the Ohio Constitution and the statutory provisions providing a right of appeal under R.C. 2101.42 and 2505.02.

       *B. Any adversity concerns presented here do not require dismissal*

**{¶ 79}** If adversity presents any problem for courts in Ohio, it is not a problem affecting the *jurisdiction* of the courts. The General Assembly has specifically provided authority to courts to adjudicate noncontentious actions,[5] and courts have long had the judicial power to hear and decide them. When courts were formally established in Ohio, the legislature recognized that there were nonadversarial actions. As one scholar has explained,

> The Act Organizing the Judicial Courts [of 1803] also gave the court of common pleas an additional jurisdiction. The statute granted the court "power to examine and take the proof of wills, to grant administration on intestate estates, and to hear and determine all causes, suits and controversies of a probate and testamentary nature, to appoint guardians for minors, idiots and lunatics, and to call such guardians to account."

---

5. Examples of noncontentious causes of action in Ohio include an application for change of name, R.C. 2717.02; an application for attorney fees in the administration of an estate, R.C. 2113.36; a petition for adoption of an adult, R.C. 3107.02; an application for authority to expend guardianship funds, Sup.R. 66(B); an application for approval in advance of a transfer of structured-settlement-payment rights, R.C. 2323.584; an application for a marriage license, R.C. 3101.05; a petition for judicial bypass of parental notification before obtaining an abortion, R.C. 2151.85; and a petition to enforce a victim's rights, Ohio Const., art. 1, § 10a. In other situations, a case may not have adversity because of the waiver or ascension of another party, but that has not prevented this court from reaching a decision in such a matter. *See, e.g.*, *State ex rel. Martre v. Cheney*, 2023-Ohio-4594, ¶ 1 (affirming court of appeals' judgment, even though no opposing merit brief was filed in this court on appeal); *Furr v. Ruehlman,* 2023-Ohio-481, ¶ 1 (same).

John F. Winkler, *The Probate Courts of Ohio*, 28 U.Tol.L.Rev. 563, 570 (1997), quoting 1 Ohio Laws 35, 39-40.

{¶ 80} Even considering this history of Ohio's courts, the separate opinion advancing an adversity theory finds Adelaide's appeal to be defective because if she were to prevail, "no other person or entity would suffer a diminution of a legal interest," separate opinion of Deters, J., at ¶ 103. The rule of law is not a zero-sum game, and it never has been. This is because people and their interests and concerns are not figuratively black and white. The judiciary holds a unique fact-finding role that often involves humanity's many shades of gray. Adelaide's claim before the probate court did not require her to find an opposing party or adverse interest before she applied for a correction of the sex marker on her birth certificate. *See* R.C. 3705.15. An actual "disagreement" may be necessary in causes of action that require resolution of claims or disputes between or among parties. But the separate opinion advancing an adversity theory does not demonstrate or even discuss why adversity should be required for appeals of judgments from original causes of action that are noncontentious by their nature.

{¶ 81} Why does an application filed in a probate court to change a name and a sex marker require an adverse person or interest before a decision on the application may be appealed? No caselaw cited by the separate opinion advancing an adversity theory answers this question or helps to resolve the anomaly of this position. Justice Deters's separate opinion claims that the need for adversity is reflected in Article III of the United States Constitution and in cases decided by the United States Supreme Court. *See* separate opinion of Deters, J., at ¶ 100. However, this court is not bound by federal Article III jurisprudence.

{¶ 82} It is also clear that Adelaide had standing. She had a right to apply to the probate court for correction of her birth record, *see* R.C. 3705.15, and she had a right to appeal the probate court's judgment, *see* R.C. 2101.42 and 2505.02. Her case has *never* involved another party, and there is no statutory authority that

says that she has to find a party who opposes her application in order for her appeal to survive. Federal Article III jurisprudence does not require an adversarial interest or party in special proceedings such as Adelaide's appeal; it therefore has no application here.

{¶ 83} The separate opinion advancing an adversity theory also relies on *State ex rel. Barclays Bank PLC v. Hamilton Cty. Court of Common Pleas*, 1996-Ohio-286, and *State ex rel. Lorain Cty. Bd. of Commrs. v. Lorain Cty. Court of Common Pleas*, 2015-Ohio-3704, both of which are writ-of-prohibition cases. In *Barclays Bank*, we found that the trial court lacked subject-matter jurisdiction because the parties lacked sufficiently adverse interests and failed to join "the only entity with the motive and means to oppose" the underlying action. *Barclays Bank* at ¶ 22. In examining the trial court's jurisdiction based on whether there was an "actual controversy," we determined that without the adverse party—the actual wrongdoer—the plaintiffs could not establish a claim upon which relief could be granted. *Id*. at ¶ 22-23. In *Lorain Cty. Bd. of Commrs.*, this court granted a writ of prohibition because a former and the then-current administrative judge of the Lorain County Common Pleas Court had issued orders without any party ever filing suit. *Lorain Cty. Bd. of Commrs.* at ¶ 1-2. These cases underscore why an actual controversy would be necessary to invoke the judicial power of a trial court, but they do not explain why Adelaide cannot appeal the probate court's decision here.

{¶ 84} Justice Deters's reliance on *Barclays Bank* and *Lorain Cty. Bd. of Commrs.* seems more akin to trying to hold open the door to a legislative-committee hearing so that an adverse party may be heard rather than reviewing an appeal of a special-proceeding judgment. Courts regularly hear appeals of probate-court decisions, whether the underlying action is adversarial or not. Adelaide does not need an adverse party to apply for a correction of the sex marker on her birth certificate or to appeal the denial of that application.

**{¶ 85}** The separate opinion advancing an adversity theory falls below even a fringe theory of justiciability. And even if it were a recognized theory, it has been rejected in other forums. *See, e.g.*, *In re Childers-Gray*, 2021 UT 13, ¶ 20-21. It should be rejected in Adelaide's case, too, because our own jurisprudence requires it.

**{¶ 86}** In 1878, this court undertook a constitutional review of a law; no named party existed in the case and a decision about the constitutionality of the law was made solely following consideration of amici curiae briefs. *See In re Assignment of Judges to Hold Dist. Courts*, 34 Ohio St. 431 (1878). More recently, this court considered and decided matters with no opposing party. *See Jane Doe 1*, 57 Ohio St.3d at 135-136; *Bonfield*, 2002-Ohio-6660, at ¶ 4; *Bicknell*, 2002-Ohio-3615, at ¶ 1. We have permitted an amicus brief to be designated as a merit brief after an appellant failed to file a merit brief, *see Dunn*, 2024-Ohio-1794, even though dismissal would have been allowed under our rules, S.Ct.Prac.R. 16.07(A) ("If the appellant fails to file a merit brief . . . , the Supreme Court may dismiss the appeal."). And we have made other exceptions to what otherwise would have been characterized as nonjusticiable claims in the interest of judicial economy, fairness, and public importance. *See, e.g.*, *State v. Bishop*, 2018-Ohio-5132, ¶ 27 (DeWine, J., concurring in judgment only) ("We have . . . decided cases that were moot after having found that the issues presented were capable of repetition yet evading review.").

**{¶ 87}** The separate opinion advancing an adversity theory unwisely ignores these precedents in favor of a strained judicial rule that disregards the fact that R.C. 3705.15 is a special proceeding as defined by R.C. 2505.02(A)(2). Denying an appeal from that special proceeding would unconstitutionally deprive unopposed appellants such as Adelaide of any right to appeal. And such a denial violates R.C. 2505.02(A)(2) and (B)(2), which provides Adelaide the right to appeal a final order made in a special proceeding. In ignoring this law, the separate opinion

advancing an adversity theory seems unable to resist the temptation to recraft Ohio's laws regarding appealable orders when there is no authority to do so. We are not the legislature. Certainly, before this court were to move in such a radical direction, there should be *some* presentation of the issue, including additional briefing.

{¶ 88} Further, there are several means to mitigate prudential concerns regarding the presentation of adverse arguments. *See, e.g.*, *Windsor*, 570 U.S. at 761 (finding the intervenor's "sharp adversarial presentation of the issues" alleviated the concerns of a nonadversarial appeal). A court having bona fide adversarial concerns may appoint an adverse amicus curiae, a law professor, or a state agency to raise counterarguments to the arguments presented by a person such as Adelaide. But suggesting that the decision of the court of appeals should be vacated and this case dismissed based on a radical and untested theory of Ohio appellate jurisdiction is grossly unworkable and lacking in justice. No law or constitutional provision *requires* the presence of an adverse party in a special proceeding to resolve questions of law on appeal in Ohio. *See* Ohio Const., art. IV, § 1; R.C. 2101.42; R.C. 2505.02.

{¶ 89} Applicants like Adelaide are depending on this court to determine what the law is—that is, whether R.C. 3705.15 provides them the constitutional rights discussed by the federal court in *Ray*. And as the decision of the probate court in this case shows, some lower courts apparently want clarity from this court regarding how the decision in *Ray* affects the use of R.C. 3705.15 in cases such as Adelaide's. This court's splintered decision in this case denies Ohio's lower courts any clarity, and persons who are transgender in some counties of this State may not be afforded the right to correct their birth certificates under R.C. 3705.15.

{¶ 90} This court has publicly recognized the shortage of attorneys in Ohio's 82 primarily nonurban counties (out of 88 counties) and has undertaken specific efforts to increase the density of legal representation across the State,

44

including helping to inform Ohio attorneys about legislation that authorizes the State to pay a portion of student loans of new attorneys who choose to work in those 82 counties.[6] The State's probate-court judges should similarly be affording the same legal recourse in *all* of Ohio's 88 counties, applying the statute at issue in Adelaide's case—R.C. 3705.15—consistently by following the constitutional principles that the federal court applied in *Ray*, 507 F.Supp.3d at 937—namely, that persons who are transgender "are entitled to heightened protection under the Equal Protection Clause as a quasi-suspect class." This, like the dearth of attorneys in 82 counties of this State, is an access-to-justice issue.

{¶ 91} Regardless of whether adversity is as important an issue as the separate opinion advancing an adversity theory says it is, the duty still exists to carry out our primary responsibilities and say what the law is. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). And when newly raised concerns about adversity may be fairly addressed by utilizing procedural mechanisms that would lead to a broadening of the discussion, dismissing an appeal without utilizing those procedural mechanisms is wrongheaded and unjust.

### IV. Conclusion

{¶ 92} The law provides that a person may apply to have the sex marker on his or her birth certificate corrected, without exception. R.C. 3705.15 does not prohibit probate courts from considering applications filed by persons who are transgender or seeking to correct the sex markers on their birth records. If a probate court denies an application for a sex-marker correction because it finds that the facts do not warrant a correction under the statute, the reviewing court should, as a matter

---

6. Sukosd, *Rural Attorney Program Repays Student Loans* (Jan. 31, 2024), https://www.courtnewsohio.gov/happening/2024/RuralAttorneyProgram_013124.asp (accessed May 23, 2024) [https://perma.cc/Z7J5-JHRK] ("'Today, nearly 75% of Ohio lawyers practice in the state's six largest counties, leaving 56% of Ohioans with too few attorneys to meet their legal needs,' said Supreme Court of Ohio Chief Justice Sharon L. Kennedy.").

of law, examine that decision under the standard required of appellate courts in reviewing denials of R.C. 3705.15 applications—abuse of discretion. This includes the failure to follow the simple precepts of R.C. 3705.15.

> "No court—not a trial court, not an appellate court, nor even a supreme court—has the authority, within its discretion, to commit an error of law." This should be axiomatic: a court does not have discretion to misapply the law.

*Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38, quoting *State v. Boles*, 2010-Ohio-278, ¶ 26 (2d Dist.). The Second District Court of Appeals' judgment should be reversed and the case remanded to the probate court for that court to consider the merits of Adelaide's application to correct the sex marker on her birth certificate from male to female. Because this court has strayed far from this simple course of review, I respectfully offer this separate opinion.

———————————

**DETERS, J., joined by KENNEDY, C.J., and DEWINE, J., for reversing the court of appeals' judgment and remanding the cause to that court.**

{¶ 93} Hailey Emmeline Adelaide filed an application in the Clark County Probate Court to correct the sex marker on her birth certificate. The probate court denied her application, and she appealed that decision to the Second District Court of Appeals. After the court of appeals affirmed the probate court's denial, she appealed the judgment of the court of appeals to this court and we accepted her appeal to review three propositions of law.

{¶ 94} Throughout the proceedings, there has been no opposition to Adelaide's application. No other person or entity has a legal interest that would be diminished by the granting of her application. Her appeal to the court of appeals and her appeal to this court have lacked adversity. Because the judicial power given

to Ohio's courts extends only to those cases that involve adverse interests, the court of appeals did not have the power to decide Adelaide's appeal.[7] Therefore, I would reverse the judgment of the court of appeals and remand the case to that court for it to dismiss Adelaide's appeal.

### Background

**{¶ 95}** In 1973, Adelaide was born a male and named Brian Edward DeBoard. Her birth certificate, accordingly, stated that name and gender. In 2021, Adelaide filed two applications with the probate court. The first sought to change the name on her birth certificate to Hailey Emmeline Adelaide, and the second sought to correct the sex marker on her birth certificate from male to female. At a hearing on her applications, Adelaide explained that she began believing she was a female at four years old and that she currently identified as female. In her view, the sex marker identifying her as male was incorrect, because it did not take into account how she would identify herself.

**{¶ 96}** At the conclusion of the hearing, the probate court granted Adelaide's name-change application, and following further briefing from Adelaide, the court denied her application to correct the sex marker on her birth certificate. The court determined that R.C. 3705.15 allowed it to correct a sex marker on a birth certificate only if the information was improperly recorded at the time of birth. Because Adelaide was born with male anatomy, the court found that the sex marker on her birth certificate was properly recorded as male and that it was not authorized to correct the sex marker. Adelaide appealed to the Second District, which affirmed the probate court's judgment. 2022-Ohio-2053, ¶ 1, 27 (2d Dist.).

---

7. Justice Donnelly proclaims that resolution of this appeal is being prevented by the justices who join in this separate opinion and their refusal to act beyond this court's judicial power. *See* separate opinion of Donnelly, J., ¶ 30. While Justice Donnelly may brush off the limits of the court's constitutionally provided power—limits that have been long recognized by this court, as demonstrated below in this separate opinion—as procedural theory, the justices who join in this separate opinion decline to ignore the bounds of this court's authority for purposes of expediency.

**{¶ 97}** We accepted Adelaide's discretionary appeal to review three propositions of law:

> Proposition of Law No. 1: The plain language of R.C. 3705.15 does not preclude probate courts from hearing a transgender person's application to correct the sex-marker of her birth certificate.

> Proposition of Law No. 2: Even if R.C. 3705.15 were ambiguous, the statute should be construed to avoid the unappealed constitutional injuries found in [*Ray v. McCloud*, 507 F.Supp.3d 925 (S.D.Ohio 2020)], which have prompted the relevant state agencies and a number of courts (including the Ohio Supreme Court) to adopt implementing guidance.

> Proposition of Law No. 3: A state court should give persuasive weight to a federal court's conclusion that a specific application of a state statute violates the U.S. Constitution when all relevant data points support the federal court's decision and the state agencies charged with implementing the law acquiesce to the ruling.

*See* 2022-Ohio-3546.

## Analysis

**{¶ 98}** The court of appeals' judgment was grounded in its conclusion that R.C. 3705.15 did not authorize the probate court to change or amend the sex marker on Adelaide's birth certificate because the sex marker was correct when it was recorded. 2022-Ohio-2053 at ¶ 16-17, 24-25 (2d Dist.). But before considering the merits of Adelaide's appeal to this court, we must first ensure that resolution of the issues falls within our judicial power—i.e., that there is an "'actual controvers[y]'"

48

before us (bracketed text in original), *M.R. v. Niesen*, 2022-Ohio-1130, ¶ 7, quoting *Fortner v. Thomas*, 22 Ohio St.2d 13, 14 (1970).

{¶ 99} The Ohio Constitution vests "[t]he judicial power of the state" in this court and the inferior courts. Ohio Const., art. IV, § 1. "What constitutes judicial power, within the meaning of the constitution, is to be determined in the light of the common law and of the history of our institutions as they existed anterior to and at the time of the adoption of the constitution." *State ex rel. Atty Gen. v. Harmon*, 31 Ohio St. 250, 258 (1877).

{¶ 100} The judicial power has long been understood to require adversity. In 1768, English scholar William Blackstone wrote that a judicial proceeding requires three parts: "the *actor*, or plaintiff, who complains of an injury done; the *resus*, or defendant, who is called upon to make satisfaction for it; and the *judex*, or judicial power." (Emphasis in original.) 3 William Blackstone, *Commentaries on the Laws of England* 25 (1768). This need for adversity is reflected in the "cases" and "controversies" language in the United States Constitution, *see* U.S. Const., art. III, § 2, and in many cases decided by the United States Supreme Court, *see* Woolhandler, *Adverse Interests and Article III*, 111 Nw.U.L.Rev. 1025, 1027, fn. 4 (2017) (collecting cases).

{¶ 101} In Ohio, it has long been understood that judicial power extends only "to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect." *Fortner*, 22 Ohio St.2d at 14. "Actual controversies are presented only when the plaintiff sues an adverse party. This means not merely a party in sharp and acrimonious disagreement with the plaintiff, but a party from whose adverse conduct or adverse property interest the plaintiff properly claims the protection of the law." *State ex rel. Barclays Bank PLC v. Hamilton Cty. Court of Common Pleas*, 1996-Ohio-286, ¶ 21. This is not a "fringe theory of justiciability," as Justice Brunner asserts. Separate opinion of Brunner, J., ¶ 85. This court has repeatedly emphasized the

need for there to be an actual controversy in a case before a court may exercise its judicial power over the case. *See, e.g.*, *State ex rel. Lorain Cty. Bd. of Commrs. v. Lorain Cty. Court of Common Pleas*, 2015-Ohio-3704, ¶ 21; *Fortner* at 14; *Barclays Bank* at ¶ 21.

{¶ 102} Adelaide's appeal lacks this necessary adversity. She seeks no protection from the conduct of any other party. And no party claims to have a competing interest as to a change to the sex marker on Adelaide's birth certificate. Put in terms of Blackstone's *Commentaries on the Laws of England***,** a decision in favor of Adelaide in this matter would not call on any party **"**to make satisfaction for**"** the injury to her. 4 Blackstone at 25.

{¶ 103} At oral argument, counsel for Adelaide acknowledged that there was no opposition to Adelaide's application. There was also discussion about whether the adversity problem could be alleviated by appointment of a party to provide an adverse view. But the problem is not the absence of adverse argument. Instead, there is no opposing interest. Were the probate court to grant Adelaide's application, no other person or entity would suffer a diminution of a legal interest. This is why this court cannot remedy the adversity issue by doing what Justice Brunner suggests and ordering additional briefing or appointing an adverse party to raise counterarguments. *See* separate opinion of Brunner, J., at ¶ 87-88. With no interest adverse to Adelaide's, there is no counterargument to be made.

{¶ 104} Nor does Adelaide's disagreement with the probate court's denial of her application create the adversity required to invoke the judicial power of the court of appeals or this court. "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient to create an actual controversy if the parties to the action do not have adverse legal interests." *Barclays Bank*, 1996-Ohio-286, at paragraph one of the syllabus. The probate court itself has no legal interest regarding whether the sex marker on Adelaide's birth certificate is changed.

{¶ 105} Justice Brunner conflates the absence of an adverse interest with the failure (intentional or otherwise) of an adverse party to defend that interest. Justice Brunner insists that we have "decided matters on a lack of adversity theory in the past," citing three cases in support. Separate opinion of Brunner, J., at ¶ 51. But it is the existence of the adverse interest that matters, not whether the party has appeared to advocate for its interests. And in two of the three cases cited by Justice Brunner, while the adverse party did not assert his or her rights, the court's adjudication of the case necessarily affected the legal interest of some other party. *See In re Jane Doe 1*, 57 Ohio St.3d 135 (1991) (resolution of a minor's application for judicial bypass necessarily affected parents' right to the care, custody, and control of their child); *In re Bonfield*, 2002-Ohio-6660 (shared-parenting plan necessarily affected the biological parent's rights). In any event, none of the three cases considered whether there was an adverse interest present, so they have no stare decisis effect on the case before us, *see N.A.T. Transp., Inc. v. McClain*, 2021-Ohio-1374, ¶ 24 ("prior decisions of this court did not have stare decisis effect, because the issue to be resolved in the case before this court was not actually litigated and decided in those decisions"), citing *State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 2008-Ohio-6254, ¶ 39.

{¶ 106} While the Ohio Constitution grants courts of appeals jurisdiction "as may be provided by law," art. IV, § 3(B)(2), and the General Assembly has provided for appellate review of final orders stemming from probate proceedings, *see* R.C. 2101.42 and 2505.02, these provisions do not eliminate the necessity of an adverse interest before a case may be brought to the court. Though these provisions do not "require[] adversity to invoke the jurisdiction of Ohio's appellate courts," separate opinion of Brunner, J., at ¶ 76, an Ohio court's power of appellate review is limited to the resolution of "actual controversies," *Travis v. Pub. Util.*

*Comm.*, 123 Ohio St. 355, 359 (1931). When there is no adverse interest, there is no controversy for this court to decide.[8]

{¶ 107} The lack of an adverse interest in this case stems from the probate court's unique statutory role. The Ohio Revised Code empowers probate courts to perform a variety of functions that require the exercise of the judicial power in adversarial proceedings. For example, probate courts decide actions contesting the validity of wills, R.C. 2101.24(A)(1)(p), issue declaratory judgments relating to the validity of wills and trusts, R.C. 2101.24(A)(1)(l), and determine actions relating to the disinterment and reinterment of human remains, R.C. 2101.24(A)(1)(dd). But probate courts are also vested with certain administrative functions that do not involve adversarial interests. These include granting marriage licenses, R.C. 2101.24(A)(1)(f), solemnizing marriages, R.C. 2101.27, and appointing commissioners of park-district boards, R.C. 1545.05. Just as one cannot appeal a probate court's decision on whom to place on a park-district board, one cannot appeal a probate court's decision on whether to change a sex marker on a birth certificate.

{¶ 108} As a final note, Justice Brunner intimates that this separate opinion "seems unable to resist the temptation to recraft Ohio's laws regarding appealable orders when there is no authority to do so." Separate opinion of Brunner, J., at ¶ 87. This is not true. Rather, this separate opinion recognizes the limits of judicial power. And those limits cannot be ignored to further what might be politically expedient or popular.

---

8. Justice Brunner also questions whether Adelaide and others are precluded from seeking "extraordinary relief" or any other type of relief in cases such as this. Separate opinion of Brunner, J., at ¶ 53. I believe that there is nothing that would foreclose any ability of Adelaide to seek another form of relief.

**Conclusion**

{¶ 109} The judicial power extends only to actual controversies in which there are adverse interests. In this case, there was no adverse interest to Adelaide's application to correct the sex marker on her birth certificate. Thus, the court of appeals had no power to determine her appeal of the probate court's denial of her application. I would therefore reverse the judgment of the Second District Court of Appeals and remand the case to that court for it to dismiss Adelaide's appeal.

————————————

Tucker Ellis, L.L.P., and Chad M. Eggspuehler; and Equality Ohio Legal Clinic and Maya Simek, for appellant.

Transgender Legal Defense and Education Fund, Inc., and Z. Gabriel Arkles; and Cooper & Elliott, L.L.C., and C. Benjamin Cooper, urging reversal for amici curiae Transgender Legal Defense and Education Fund, Black and Pink National, and National Queer Asian and Pacific Islander Alliance.

Wilmer Cutler Pickering Hale & Dorr, L.L.P., Mark Selwyn, Andrew Waks, and Quentin Sims; Public Rights Project and Joshua Rosenthal; and Zachary M. Klein, Columbus City Attorney, urging reversal for amicus curiae City of Columbus.

Emily Smart Woerner, City Solicitor, urging reversal for amicus curiae City of Cincinnati.

Flowers & Grube, Louis E. Grube, Paul W. Flowers, and Melissa A. Ghrist; and TransOhio, Inc., and James C. Knapp, urging reversal for amici curiae TransOhio, Inc., Ace and Aro Alliance of Central Ohio, BCC Full Spectrum Community Outreach, BGO Pride Association, Black Transmen of Ohio, Cleveland Bi+ Network, Columbus Trans Pride, Crossport Cincy, Equitas Health, GLSEN Central Ohio, LOVEboldly, Margie's Hope, META Center, Inc., Organizing Communities Transgender Outreach Promoting United Support ("OCTOPUS"), L.L.C., OutSupport, Positive Progressions, Transgender Advocacy

Council, TransAlive, TransCend Canton, TransFamily Cleveland, and Transgender Mentorship of Cincinnati.

_____